IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANK ALBERT FLOREZ,<br><br>Petitioner,<br><br>vs.<br><br>THOMAS L. CAREY, Warden,<br><br>Respondent. | No C 06- 4141 JSW (PR)<br><br>ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS |

## **INTRODUCTION**

Petitioner, a prisoner of the State of California incarcerated at the California Substance Abuse Treatment Facility in Corcoran, California, has filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. This Court ordered Respondent to show cause why a writ should not be granted. Respondent filed an answer, memorandum and exhibits in support thereof and Petitioner filed a traverse. For the reasons stated below, the petition is denied on the merits.

## **PROCEDURAL BACKGROUND**

On September 16, 2003, a jury convicted petitioner of shooting into an inhabited building and illegally possessing a firearm. The jury also found gang enhancements true for both charges, but deadlocked on whether petitioner was guilty of murder. The court dismissed the murder charge on the prosecution's motion. Petitioner was sentenced to an indeterminate state prison term of 15

years to life for shooting into an inhabited building and a concurrent 7 year term for the possession of a firearm.

Petitioner appealed to the California Court of Appeal. On August 30, 2005, that court issued a decision ordering sentence modification but otherwise affirming the judgement. On October 6, 2005, Petitioner filed a petition for review in the California Supreme Court. On December 15, 2005, the Supreme Court denied review. On June 5, 2006, Petitioner filed the instant petition.

## **FACTUAL BACKGROUND**

The facts underlying the charged offenses, as found by the California Court of Appeal, Exhibit 5 at 2-5, are summarized in relevant part, as follows:

Florez was a member of the "Don't Give A Fuck" (D.G.F.), a criminal street gang. He had an ongoing rivalry with David Ruiz, a member of the Campo Ramos Locos (C.R.L.), another criminal street gang. Five months before the April 21, 2001 incident that was the basis of the current charges against Florez, someone set fire to the Ruiz house. A week later, someone set fire to the Florez house. Eight days later, someone firebombed the Ruiz house.

In the early morning of April 21, 2001, according to Florez, Ruiz fired several shots at petitioner's car, breaking the rear windshield. Shortly after the event, Florez called several of his fellow D.G.F members on his cellular telephone. At about the same time, James "Jimbo" Wooldridge, known as a D.G.F gang member, received a telephone call from Melly (Melissa) Torre. Wooldridge asked Torre to meet him on Ruus Road, and she agreed. Wooldridge had met Torre one or two days earlier when April Witt, a D.G.F. gang affiliate, introduced them. Together with April Witt and another friend, Gabriela Gonzalez, also a D.G.F gang affiliate, Torre drove her two-door car to Ruus Road. According to Witt, Torre had been living in the area for a few months and she was not a gang member.

Arriving at Ruus Road, Torre, Witt, and Gonzalez met several men, including Florez, Wooldridge, and other members of the D.G.F. gang. Witt and Gonzalez saw that the windows of petitioner's car had been shot out. Florez was pacing and angry. He told Gonzalez that, while he was driving, somebody shot at his car. It appeared to Witt that everyone, not just Florez, wanted to retaliate because of what happened to Florez.

Florez asked Witt and then Gonzalez to drive him home in Torre's car, but they each refused. When Florez asked Torre, she agreed to take

2

him home.  Witt told Torre she should not drive Florez home because of what had happened to Florez's car, but Torre indicated she had no problem driving Florez.  Witt and Gonzalez drove away in an SUV, leaving Florez and Torre at Ruus Road.[1]

At 4:25 a.m., the police received several telephone calls reporting gunfire at the Ruiz house.  At that time, Ruiz was not at home; his parents and younger brother were in the house.  Neighbors heard several rapid gunshots, followed by a pause, and then more gunshots.  When the police arrived, they found 14 bullet holes in the front of the Ruiz house.  The bullets went through a big picture window.  Some of the bullets struck the house frame and other bullets went through the door of the master bedroom used by Ruiz's parents, hitting the back bedroom wall.  The police found Winchester-brand cartridge casings outside the house, and corresponding bullets inside the house that had been fired from a Cobray semiautomatic pistol.

Torre's car was in the middle of the street in front of the Ruiz house.  The police found Torre dead in the driver's seat.  The passenger door was open and the passenger's seat was not pushed forward; there was a radio on the back seat.  Florez's cellular telephone was on the dashboard.  Ballistic evidence showed someone had repeatedly shot Torre at close range with an unknown firearm using Federal-brand ammunition.  The shooter most likely fired from the passenger side of the car.

About five minutes after the shooting, members of the Alarcon family that lived nearby saw two unknown men beating Florez.  After the beating Florez collapsed outside the Alarcon house.  Florez said he had been shot in the leg or foot and hit on his head with a gun.

In the area between the Ruiz and Alarcon houses, the police found the Cobray semiautomatic gun that was fired at the Ruiz house.  The police did not recover the gun that was fired at Torre, but they did find parts of another gun.  Additionally, the police found a bloody sweatshirt with Florez's DNA on it and a hole in it surrounded by gunpowder particles, footprints consistent with Florez's shoes, a beanie hat containing the DNA of three people, including Florez but excluding Ruiz, and other beanie hat also containing DNA of three people, including Ruiz but excluding Florez.  The name "Joker" was found carved on a fence adjoining the Ruiz property.  Ruiz's father testified that the inscriptions had been there for several years.

---

[1]At trial, Witt and Wooldridge did not stay with Florez and Torre.  Gonzalez told the police that Torre got into Torre's care with Torre in the driver's seat, Wooldridge in the front seat, and Florez in the back seat.  But at trial, Gonzalez testified that she did not recall seeing Wooldridge at Ruus Road, and that she had lied to the police.  Gonzalez also refused to say whether she had ever been threatened by Wooldridge.

In support of the gang allegations in the information, prosecution witness Hayward Police Inspector John Mario Lage testified as an expert regarding gang-related crime in southern Alameda County.  In his opinion, the primary activities of the D.G.F. gang included homicides, attempted homicides, drive-by shootings into inhabited dwellings, stabbing, serious beatings, burglaries, and the sale of drugs.  In support of his opinion, Lage testified that in March of 1999, petitioner and two other D.G.F. gang members had been arrested and later convicted of selling drugs, and that, on January 26, 2001, other D.G.F. gang members had been convicted of offenses based upon an incident concerning an attempted murder and shooting into an inhabited dwelling.  The prosecution submitted official court records regarding the convictions.  After giving Lage a "hypothetical" based upon the facts in this case, Lage opined that the shooting into the Ruiz house was done for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further or assist the criminal conduct of gang members.

Lage based his opinion on the fact that the shooting at the Ruiz house occurred immediately after Florez had been targeted for violence that was attributed to a rival of Florez's gang.  Additionally, the shooting added to the reputation of the gang's infamy and stature, not just in the rivalry against the C.R.L. gang but in the larger gang subculture.  Lage also opined that, as a general rule, a gang member was expected to take an active part in retaliating against his rivals and not have someone else do it for him.  According to Lage, given the timing and the circumstances of the incident, there was no innocent explanation for the presence of a D.G.F. gang member in the neighborhood of a C.R.L. gang member.  Lage was also questioned regarding the "Joker" carving on a fence at the Ruiz house.  According to Lage, Joker was Florez's nickname and leaving the name on a rival gang's territory was as sign of disrespect.  Assuming "Joker"was a rival gang member's nickname, it was highly unlikely that the inscription would have been left on the fence; normally, it would have been erased very quickly.

Lage described in detail the bases of his opinions, which included: Florez's admissions of gang membership as recorded in field identification cards, tattoos, symbols, nicknames, statements to the police by other gang members, gang affiliates, and community members, the commission of criminal activity by Florez and other D.G.F. gang members, police reports, and items obtained in a probation search of Florez's home two years before the April 21, 2001, incident, including photographs of Florez in gang attire and using gang hand signs, and a notebook that contained gang graffiti, drawings, and writings.

## **STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the

ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  A district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Under the 'contrary to' clause, a federal habeas court may grant the writ if a state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if a state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413.  As summarized by the Ninth Circuit: "A state court's decision can involve an 'unreasonable application' of federal law if it either 1) correctly identifies the governing rule but then applies it to a new set of facts in a way that is objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143, 1150 (9th Cir. 2000) *overruled on other grounds*; *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003) (citing *Williams*, 529 U.S. at 405-07).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must not only be erroneous, but objectively unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

In deciding whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of the Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000).

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings of the Supreme Court as of the time of the state court decision. *Williams* 529 U.S. at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While the circuit law may be "persuasive authority" for the purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id*.

If the state court decision only considered state law, the federal court must ask whether state law, as explained by the state court, is "contrary to" clearly established governing federal law. *See Lockhart v. Terhune*, 250 F.3d 1223,

1230  (9th Cir. 2001); *see, e.g., Hernandez v. Small*, 282 F.3d 1132, 1141 (9th Cir. 2002) (state court applied correct controlling authority when it relied on state court case that quoted Supreme Court for proposition squarely in accord with controlling authority).  If the state court, relying on state law, correctly identified the governing federal legal rules, the federal court must ask whether the state court applied them unreasonably to the facts.  *See Lockhart*, 250 F.3d at 1232.

## DISCUSSION

In his petition for a writ of habeas corpus, Petitioner asserts five claims for relief: (1) the trial court violated Petitioner's rights to due process and a fair trial by admitting "personal notebook entries" in support of the gang allegations; (2) he was subjected to prosecutorial misconduct involving the prosecutory's use of the notebook evidence; (3) the trial court's use of CALJIC No. 2.21.2 violated Petitioner's due process rights; (4) the trial court's response to jury requests violated Petitioner's rights to due process and a fair trial; and (5) cumulative error.

**A.**   **Admission of the Notebook**

Petitioner argues that admission of his gang notebook, recovered during a probation search of his house, violated due process because it was overly prejudicial.  The 10 page notebook included drawings, D.G.F. symbols and hand signs, the word Joker (Petitioner's gang nickname) and initials of other rival gang members with X's crossed over them.  The notebook also contained poems describing acts of violence, glorification of gang lifestyle and D.G.F.'s supremacy over other gangs.  One poem described an incident that was very similar to a drug sale that lead to Petitioner's arrest in 1999.  Exhibit 5 at 6.

During a pre-trial hearing, Petitioner attempted to preclude Officer Lage

7

from testifying at trial that his expert opinion was based on the contents of the notebook.  Exhibit 5 at 5-6.  At the hearing, Lage testified that the notebook confirmed his opinion that Petitioner was a gang member but that his opinion was not dependant on it.  Exhibit 5 at 6.

The trial court concluded that the notebook was "simply additional and corroborative evidence being relied upon by the expert."  The court found that although the notebook was damaging it was relevant to the issues at trial, especially the issue of whether Petitioner committed the charged crimes in furtherance of or for the benefit of the D.G.F. gang.  Exhibit 5 at 7.  The jury was instructed that "the notebook and other evidence that formed the basis of Officer Lage's expert opinions regarding gang psychology and sociology . . . cannot be considered . . . for the truth but merely as the basis for the gang expert's opinions."  Exhibit 10 at Reporter's Transcript (hereinafter "RT") at 934.  After redacting two lines from the notebook the court denied Petitioner's motion to preclude.  Exhibit 5 at 7.

### 1. Legal Standard

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).  Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds.  *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).  While adherence to state evidentiary rules suggests that the trial was conducted in a

procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness. *See id.* (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983), *cert. denied*, 469 U.S. 838 (1984)). The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990.

The admission of prejudicial evidence violates due process only if there were no permissible inferences the jury could have drawn from the evidence (in other words, no inference other than conduct in conformity therewith). *See McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir. 1993); *Jammal*, 926 F.2d at 920. Furthermore, the evidence must be of such highly inflammatory or emotionally charged quality as necessarily prevents a fair trial. *See McKinney*, 993 F.2d at 1384-85; *Jammal*, 926 F.2d at 920-21.

**2. Analysis**

The appeals court found that there was no abuse of discretion in the trial court admitting Petitioner's notebook at trial. Exhibit 5 at 8. The Court of Appeal reasoned that because an expert can reveal the information on which he or she has relied on in forming his or her expert opinion, including matters that are ordinarily inadmissible, Officer Lage could reveal Petitioner's notebook as a basis of his opinion. Exhibit 5 at 8. The court held that the prejudicial value of the notebook did not outweigh its probative value, especially in light of the limiting instruction given by the judge. Exhibit 5 at 9-10. In a footnote the court rejected any due process arguments that Petitioner might raise for the same

reasons it rejected his state law claims.  Exhibit 5 at 10 n.4.

Petitioner is entitled to relief on this claim "[o]nly if there are *no* permissible inferences the jury may draw from the evidence."  *Jammal*, 926 F.2d at 920 (italics in original).  Petitioner argues that there were no permissible inferences that the jury could draw from the notebook, but this is not the case.  Petitioner's notebook was written in red ink and had the number 14 inscribed on it, which Officer Lage testified were indicators of membership in a Norteno affiliated gang.  Exhibit 10 at RT 597, 610.  Descriptions of gang hand signs, the letters "D.G.F." and references to "Joker" (Petitioner's gang nickname) were also present in Petitioner's notebook.  Upon viewing this evidence, a reasonable jury could draw permissible inferences about Petitioner's membership in or association with the D.G.F gang, which provided evidentiary support for the gang enhancement charges against Petitioner.  In addition to the gang references, Petitioner's notebook also contained derogatory references to gang rivals and descriptions of gang confrontations.  Exhibit 10 at RT 610-32.  This evidence would support permissible inferences related to Petitioner's motive and whether he committed the charged crimes for the benefit of the D.G.F. gang, which was an essential element of the gang enhancements charged under CA Penal Code §§186.22(b)(1)(A) and 186.22(b)(4).

In *Windham v. Merkle*, 163 F.3d 1092 (9th Cir.1998), the Ninth Circuit found that the trial court's admission of evidence of petitioner's association with the Crips gang, including a photo album linking a co-defendant to the gang and "gang expert" police officer testimony, while prejudicial, was important evidence of his motive to commit murder and therefore did not violate petitioner's right to due process.  *Id.* at 1103-04.  The court held that the gang related evidence "was

admissible to demonstrate Windham's motive for participating in the alleged crimes [and] did not violate Windham's right to due process." *Id.* at 1104. The evidence of gang affiliation in Petitioner's notebook, relied on by the expert witness, was also prejudicial, but this court does not find that there are "no permissible inferences" that the jury could draw from Petitioner's notebook, and therefore Petitioner's right to due process was not violated. *Jammal*, 926 F.2d at 920 (italics in original).

Even assuming that Petitioner's notebook did not give raise any permissible inferences, admission of the notebook was not so "highly inflammatory" that it prevented Petitioner from receiving a fair trial. *Jammal*, 926 F.2d at 920. The number "187," which was a reference to the penal code section for murder, and the phrase "live by the gun, die by the gun," were redacted from Petitioner's notebook by the trial judge for being too prejudicial. Exhibit 5 at 7 n.3. The Court of Appeal correctly pointed out that there is no reason to think that the jury could not follow the trial court's instruction limiting the use of the rest of the notebook. Exhibit 5 at 10. The gang references in Petitioner's notebook, while damaging, were not so "highly inflammatory" that the jury would disregard the limiting instruction and used the evidence for an improper purpose. *Jammal*, 926 F.2d at 920.

Petitioner relies upon *U.S. ex rel. Clemons v. Walls*, 202 F.Supp.2d 767 (N.D.Ill., 2002) *rev'd* 58 Fed.Appx. 657 (7th Cir. 2003), in support of his argument that his due process rights were denied by the admission of this evidence. In *Clemons,* the Seventh Circuit found that the trial court erred by allowing the prosecution to use evidence of the defendant's gang tattoos and inflammatory evidence from a gang expert to bolster an otherwise weak murder

case where the other evidence involved a series of biased witnesses. *Id.* at 777-78.   This Court does not find Petitioner's reliance on *Clemons* persuasive.   The case against Petitioner was much stronger than the one presented in *Clemons* and admitting into evidence excerpts from Petitioner's notebook does not involve the same level of prejudice as that suffered by the defendant in *Clemens,* which included his disrobing and displaying his gang tattoos for the jury.   Notably, there was also no charged gang enhancement in *Clemens,* so the evidence was not offered to prove an essential element of the crimes charged against him. Therefore, the Court of Appeal's determination was not contrary to or an unreasonable application of established Supreme Court precedent and this claim is denied.

### B.      Prosecutorial Misconduct

Petitioner argues that the prosecutor's statements during closing argument about Petitioner's notebook constituted prosecutorial misconduct and denied him a fair trial.   During closing argument the prosecutor referred to Petitioner's notebook several times:

> Remember, what do [D.G.F.] worship?  They worship guns and violence and death. [¶] And think about the [Petitioner's] knowledge of gang culture that is shown by the notebook he has. [¶] First of all, he's down for D.G.F.  I mean, he's got Joker tattooed on him . . . What about the worship of guns that is shown to be a part of D.G.F. that shows the defendant used a gun that night?

Exhibit 10 RT 968-69

At this point Petitioner's counsel objected.   The trial judge responded to Petitioner's objection by overruling it and then reminding the jury that the prosecutor's remarks were only argument and not evidence in the case.   The prosecutor continued during rebuttal:

> "Last, I want to talk about the notebook.  The defense characterizes that

> notebook as stupid little rap songs . . . but . . . those aren't just some stupid little rap songs that some little dilettante penned in his bedroom for fun.  That thing's a manifesto.  It describes his gang life and the way he was steeped in this gang culture. [¶]  [O]ne of these stupid little poems talks at length about [an event similar to Petitioner's prior arrest.] [¶]  So are these just scribbles of an innocent, nonviolent, friendly little gang guy[?]  They're not.

Exhibit 10 at RT 1029.

Petitioner's counsel reminded the jury of the limited purpose of this evidence during his closing argument:

> You were instructed that [the notebook] cannot be considered by you for the truth, but merely as the basis for the gang expert's opinions.  Do not consider this evidence for any other – I'm sorry, for any purpose except this limited purpose. [¶] Thank goodness the law recognizes that that evidence . . . has nothing to do with whether [Petitioner] fired the shots into the house in this case.

Exhibit 10 at RT 1013.

Just before closing arguments the judge also warned the jury that they were not to consider the notebook for the truth, but only as a basis for the gang expert's opinions.  Exhibit 10 at RT 934.

Petitioner claims that the prosecutor was arguing that the contents of the notebook should be considered as evidence of Petitioner's propensity for violence, which is outside the limited scope for which the notebook was admitted.  Petitioner maintains that this impermissible use as character evidence deprived him of due process and a fair trial.

### 1.  Legal Standard

Prosecutorial misconduct is cognizable in federal habeas corpus.  The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power.  *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A defendant's due process rights are violated when a prosecutor's

misconduct renders a trial "fundamentally unfair."  *See id.; Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under *Darden*, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness.  *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.) (citation omitted), *cert. denied*, 516 U.S. 1017 (1995).

This analysis often is conducted according to factors laid out by the *Darden* court: "(1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused."  *Tan* 413 F.3d at 1115 (*quoting Darden,* 477 U.S. at 181-82).

**2. Analysis**

In discussing Petitioner's prosecutorial misconduct claim, the Court of Appeal noted that "[a]lthough somewhat inarticulate at one point, the import of the prosecutor's references to the notebook was that the document was evidence, as interpreted by the gang expert, that [Petitioner's] shooting in to the Ruiz house was gang related."  Exhibit 5 at 10.  Later the court concluded that Petitioner's "challenges to . . . the prosecutor's closing remarks, are either without merit or do not warrant reversal."  Exhibit 5 at 19.

Contrary to Petitioner's claims, the prosecutor at Petitioner's trial did not manipulate or misstate the limited purpose for which Petitioner's notebook had

14

been admitted into evidence.  Through a limiting instruction the judge made it clear to the jury that the notebook was not to "be considered by [the jury] for the truth but merely as the basis for the gang expert's opinions."  Exhibit 10 at RT 934.  Although the prosecutor referred to Petitioner's notebook several times during closing argument, he did not refer to the notebook other than as the basis of support for Officer Lage's opinions about Petitioner's gang status, mentality and motive.  Exhibit 10 at RT 969-70.  All the things the prosecutor mentioned during closing argument, Petitioner's gang nickname ("Joker"), Petitioner's enthusiasm for guns, and the glorification of the gang lifestyle portrayed in the notebook, were discussed during Officer Lage's testimony.  Exhibit 10 at RT 590-640.  The prosecutor's discussion of these parts of Officer Lage's testimony was a permissible use of the notebook, as the prosecutor did not ask the jury to consider the contents of Petitioner's notebook for the truth of what it contained.

Even if this court were to find that the prosecutor used Petitioner's notebook as impermissible character evidence, the jury in Petitioner's case was well instructed on the permissible uses of this evidence.  The jury empaneled for Petitioner's trial received a limiting instruction from the judge and was reminded of the notebook's limited use by Petitioner's counsel during closing argument.  The instructions limiting the use of the notebook outweighed any possibility of prejudice from the prosecutor's comments.  Furthermore, "we presume jurors follow the court's instructions absent extraordinary situations." *Tan*, 413 F.3d 1101, 1115.  Petitioner has presented no convincing argument that his situation was "extraordinary." *Id.* at 1115.

Finally, the weight of the evidence against Petitioner was not so close that misconduct on the part of the prosecutor would have been given determinative weight by the jury.  The case against Petitioner was strong, and

included evidence of Petitioner's footprints, cellular phone, nickname and DNA found at the scene of the crime.  Any error committed by the prosecution during closing argument was not so egregious as to prevent Petitioner from receiving a fair trial.  In light of these facts this court cannot agree with Petitioner that the "prosecutor's remarks so infected the trial with unfairness as to make [Petitioner's] conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir.) (citation omitted). Therefore, this Court finds that the state court's decision was not contrary to or an unreasonable application of federal law.

## C.  Improper Jury Instruction

Petitioner argues that instructing the jury with CALJIC No. 2.21.2 deprived him of due process because it lessened the prosecution's burden of proof.  CALJIC No. 2.21.2 instructed the jury as follows:

> A witness who is willfully false in one material part of his or her testimony, is to be distrusted in others.  You may reject the whole testimony of a witness who willfully has testified falsely as to a material point unless from all of the evidence you believe the probability of truth favors his or her testimony in other particulars.

Exhibit 10 at RT 936

Petitioner claims that the instruction incorrectly allowed the jury to consider the evidence by a preponderance standard rather than findings facts beyond a reasonable doubt.

### 1.  Legal Standard

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process. *See Estelle v. McGuire*, 502 U.S. at 72; *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely

16

that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

Finally, the defined category of infractions that violate fundamental fairness is very narrow:  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."  *Estelle v. McGuire*, 502 U.S. at 73.

**2. Analysis**

The Court of Appeal dismissed Petitioner's claim that CALJIC No. 2.21.2 reduced the prosecution's burden of proof by citing *People v. Riel*, 22 Cal.4th 1153 (2000).  Exhibit 5 at 13.  In *Riel*, the California Supreme Court clearly stated that CALJIC No. 2.21.2 does not reduce the prosecution's burden of proof.  *Riel*, 22 Cal.4th at 1200.  CALJIC No. 2.21.2 applies to witnesses from both the prosecution and the defense.  It leaves the ultimate issue of witness credibility to the jury and does not require jurors to disregard testimony unless they believe it is untrustworthy.

Furthermore, in addition to CALJIC No. 2.21.2, the jury in Petitioner's case was properly instructed on circumstantial evidence, the presumption of innocence, the prosecution's burden of proof, and on reasonable doubt.  Exhibit 10 at RT 931, 933-34, 939-40.  The jury also was told to regard each jury instruction in light of the others.  Exhibit 10 at RT 931.

The Ninth Circuit has previously found that CALJIC No. 2.21.2 did not

17

violate due process in *Turner v. Calderon*, 281 F.3d 851 (9th Cir. 2002).  In

*Turner*, the court held that because the jury "remained free to exercise its

collective judgment to reject what it did not find trustworthy or plausible" that

CALJIC No. 2.21.2 "could not be applied in a way that challenged the

Constitution" and declined to grant a certificate of appealability on a claim that

the use of the instruction violated due process.  *Id.* at 865-66 (citing *Cupp v.*

*Naughton,* 414 U.S. 141, 149 (1973)).  Other federal district courts have reached

the same conclusion.  *Fleeman v. Castro*, No. CIV S-06-0652-FCD-CMK-P,

2009 WL 33241, at *8 (E.D.Cal. 2009) (holding that CALJIC No. 2.21.2 "does

not impermissibly alter the burden of proof as to any particular charged

offense"); *Hernandez v. Evans*, No. C 05-4364 WHA (PR), 2009 WL 111689, at

*6 (N.D.Cal. 2009) ("CALJIC [No.] 2.21.2 relates to the assessment of a

witness's credibility, which is not based on a reasonable-doubt standard, nor is it

constitutionally required to be.").  Instructing the jury with CALJIC No. 2.21.2

did not violate Petitioner's right to due process and therefore the state court's

decision was not a contrary to or an unreasonable application of federal law.

### D.  <u>Trial Court's Responses to Jury's Questions</u>

Petitioner argues that the trial court's responses to jury questions were

inadequate and denied him due process and a fair trial.  Petitioner also claims that

the reasonable doubt instruction contained in CALJIC No. 2.90 was confusing

and unhelpful to the jury.

The jury's first question to the judge was, "[i]n order to reach an alternate

interpretation of circumstantial evidence must the alternative interpretation have

equal weight?"  Exhibit 1 at 265; Exhibit 10 at RT 1046-47.  The court answered

the question and then informed the jury that additional questions might help the

court focus on what was confusing the jury.  Exhibit 10 at RT 1050-51.

The next day the jury asked for clarifying instructions on reasonable

18

doubt and the "interplay between circumstantial evidence and reasonable doubt." Exhibit 1 at 262; Exhibit 10 at RT 1062.  Upon questioning by the judge, the jury foreman clarified by asking specifically about "a possibility of an inference versus an evidentiary trail."  Exhibit 10 at RT 1063.  The court answered by re-reading the CALJIC instruction for reasonable doubt and the first two paragraphs of the circumstantial evidence instruction.  Exhibit 10 at RT 1063-65.[2]  The judge continued by asking whether the jury needed "further instruction as to any of the rest of that particular instruction on circumstantial evidence."  Exhibit 10 at RT 1066.  The foreman answered, "[T]he only question that arises is you mentioned that the reason must be based on something in evidence, is that correct?"  Exhibit 10 at RT 1066.  The judge answered by instructing the foreman that "your determinations must be based upon the evidence in this case and not from any other source" and "you must apply the law to the facts as you determine them . . . You have to accept the evidence as it was presented in this case."  Exhibit 10 at RT 1066-67

---

[2]CALJIC No. 2.90 states:"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his] [her] guilt is satisfactorily shown, [he] [she] is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving [him] [her] guilty beyond a reasonable doubt. [¶]  Reasonable doubt is defined as follows: It is not a mere possible doubt; because everything relating to human affairs is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction of the truth of the charge."

The first two paragraphs of the circumstantial evidence instruction (CALJIC No. 2.01) state: "However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.  Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt."

The next day, after the judge answered another jury question about the scheduling of future deliberations, the judge reminded the jury that "if you need anything further let us know and we will try to assist."  Exhibit 10 at RT 1089-91. After returning verdicts on two of the three counts, the jury informed the judge that it was deadlocked on the murder charge and additional instructions would not be of any help.  Exhibit 10 at RT 1092-93.

### 1. Legal Standard

"When a jury makes explicit its difficulties, a trial judge should clear them away with concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946).  The trial judge has a duty to respond to the jury's request for clarification with sufficient specificity to eliminate the jury's confusion.  *See Beardslee v. Woodford*, 358 F.3d 560, 574-75 (9th Cir. 2004) (harmless due process violation occurred when, in responding to request for clarification, court refused to give clarification and informed jury that no clarifying instructions would be given); *United States v. Frega*, 179 F.3d 793, 808-11.
(9th Cir. 1999) (trial judge's confusing response to jury's questions raised possibility that verdict was based on conduct legally inadequate to support conviction); *McDowell v. Calderon*, 130 F.3d 833, 839 (9th Cir. 1997) (same in state capital case).

However, the trial judge has wide discretion in charging the jury, a discretion which carries over to the judge's response to a question from the jury. *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003).  Also, just as a jury is presumed to follow its instructions, it is presumed to understand a judge's answer to a question.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

### 2. Analysis

The Court of Appeal found that the trial court had not abused its discretion in determining the best answers to the jury's questions.  Exhibit 5 at

18.  The court held that "[i]n the absence of any further requests from the jury, [after the trial judge's offer to help,] we assume that the court's responses dispelled any confusion on the jury's part regarding the law to be applied in this case."  Exhibit 5 at 19.

Despite the multiple questions posed by the jury, there is nothing in the record to indicate that the judge's answers were constitutionally infirm.  The trial judge answered each question with an accurate statement of the law, either taken directly from CALJIC or in the form of an explanation.  More than once, the judge asked the jury whether further clarification would help.  On the last of these instances the jury firmly responded that no additional questions would help break the deadlock.  Since a jury "is presumed to understand a judge's answer to a question," *Weeks*, 528 U.S. at 234, and the jury in Petitioner's case declined to ask any follow up questions, there is no indication that the jury did not understand its duty.  The Supreme Court examined an analogous situation in *Weeks*:

> Given that petitioner's jury was adequately instructed, and given that the trial judge responded to the jury's question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry, the question becomes whether the Constitution requires anything more. We hold that it does not.

*Weeks*, 528 U.S. at 234

Petitioner's argument that CALJIC No. 2.90 was archaic and unhelpful is also unconvincing.  In *Lisenbee v. Henry*, 166 F.3d 997, 990-1000 (9th Cir. 1999), the court considered the instruction and held that CALJIC No. 2.90 is constitutional and its use does not constitute a violation of due process.

Petitioner received a fair trial and his right to due process was not violated.  Therefore, the state court's decision was not contrary to or an unreasonably application of federal law.

21

**E.      Cumulative Error**

Petitioner claims that the cumulative effect of the alleged errors deprived him of due process and the right to a fair trial.

**1. Legal Standard**

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).

Cumulative error is more likely to be found prejudicial when the government's case is weak.  *See id.; see, e.g., Thomas*, 273 F.3d. at 1180 (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime); *Walker v. Engle*, 703 F.2d 959, 961-62, 968 (6th Cir.), *cert. denied*, 464 U.S. 951 (1983).  However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002); *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996).

**2. Analysis**

Because there was no constitutional error found in the preceding claims, there is nothing to accumulate in order to warrant relief.  Therefore, Petitioner's claim of cumulative error must be denied.

**CONCLUSION**

The state court's denial of Petitioner's habeas petition is not contrary to or an unreasonable application of established federal law as determined by the Supreme Court.  Therefore, Petitioner's petition for writ of habeas corpus must

22

be DENIED.  The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: March 2, 2009

_____
JEFFREY S. WHITE
United States District Judge

23

1

UNITED STATES DISTRICT COURT

2

FOR THE

3

NORTHERN DISTRICT OF CALIFORNIA

4

5

FRANK ALBERT FLOREZ,

6                                             Case Number: CV06-04141 JSW

              Plaintiff,

7                                             **CERTIFICATE OF SERVICE**

      v.

8

TOM CAREY et al,

9

              Defendant.

10   _____/

11

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District

12   Court, Northern District of California.

13   That on March 2, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said
     copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing

14   said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery
     receptacle located in the Clerk's office.

15

16

17   Frank Albert Florez
     V18804

18   P.O. Box 5246
     Corcoran, CA 93212

19

20                                            *Jennifer Ottolini*

     Dated: March 2, 2009

21                                            Richard W. Wieking, Clerk
                                              By: Jennifer Ottolini, Deputy Clerk

22

23

24

25

26

27

28